1

2

3

4

5

6

7

8          IN THE UNITED STATES DISTRICT COURT

9          FOR THE EASTERN DISTRICT OF CALIFORNIA

10   FERMIN CORONADO GALVEZ,

11          Petitioner,                2: 10 - cv - 485 - GEB TJB

12   vs.

13   JAMES D. HARTLEY,

14          Respondent.               ORDER, FINDINGS AND

15                                     RECOMMENDATIONS

16   _____/

17          Petitioner, Fermin Coronado Galvez, is a state prisoner proceeding with a *pro se* petition

18   for writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner is currently serving a

19   determinate sentence of ten years and eight months in prison after a jury found him guilty on two

20   counts of lewd and lascivious acts upon a child under fourteen (Cal. Penal Code § 288(a)), two

21   counts of digital penetration of a child under fourteen (*Id.* § 289(a)), one count of battery (*Id.* §

22   242), and one count of indecent exposure (*Id.* § 314(1)).  On June 11, 2010, Petitioner submitted

23   an amended petition for writ of habeas corpus.  In that petition, Petitioner raises four claims for

24   relief; specifically: (1) the redaction of two portions of a letter Petitioner wrote to the victim's

25   mother that was submitted into evidence violated his right to a complete defense and

26   fundamentally fair trial ("Claim I"); (2) the trial court erred by failing to appoint an interpreter for

1

Petitioner throughout the proceedings ("Claim II"); (3) Petitioner's trial counsel was ineffective for failing to introduce evidence during a motion for a new trial ("Claim III"); and, (4) his counsel was ineffective for failing to investigate evidence that Petitioner was at work in California a the time he was alleged to be in Utah and Nevada with the victim ("Claim IV").  For the reasons stated herein, the federal habeas petition should be denied.

## I.  FACTUAL BACKGROUND[1]

> Defendant began molesting the victim when she was nine years old and he was the live-in boyfriend of her maternal grandmother, M.

> The victim was very close to her grandmother, viewed defendant as a grandfather, and felt that defendant's child and her grandmother's children were like siblings to her.

> The first incidents took place about a week before the victim was to accompany her grandmother, defendant, and their children on a trip to Utah. While she was watching television late at night in the living room, defendant sat down on the couch next to her chair and started to hand her notes. The initial notes were simple, such as "How are you?" They then escalated to telling her she was pretty and ultimately inquiring whether she liked pornography and showing her sexually explicit photographs in several pornographic magazines. Defendant told her that one day they would do what the magazines depicted. She was "very scared" and said nothing. Defendant next asked her, "Do you want to see something?" She shrugged her shoulders, and defendant pulled down his pants, exposing himself. The victim was too scared to tell anyone what had happened.

> Two nights later, while the victim was alone on the living room couch, defendant moved her body so she was on her hands and knees, put his penis on her vagina, and penetrated her with his fingers. After hearing a noise, defendant pulled his pants up and told the victim to do the same.

> Several incidents happened during the trip to Utah, which started early the next morning. As the victim was taking a shower with her grandmother's daughter in a hotel room, defendant tried to grope the girls through the shower curtain, but failed as they scooted back. Once, when the victim was sick in bed, defendant put his

---

[1]       The factual background is taken from the California Court of Appeal, Third Appellate District decision on direct appeal from December 2008 and filed in this Court by Respondent on September 22, 2010 as Lodged Doc. No. 4 (hereinafter referred to as the "Slip Op.").  An irrelevant footnote has been omitted.

hands down her pants and molested her.

The last incident on the trip took place while they were driving in the family's van. It was late at night when the victim's grandmother was driving, her daughter was in the front passenger seat, and the two boys were sleeping in the backseat. Defendant and the victim were in the middle seats, where he put a pillow over her, quietly unzipped her pants, and penetrated her with his fingers.

The victim went home after the Utah trip, and some sort of incident took place every time she returned to visit her grandmother. For example, when her grandmother was gone, defendant would crawl into the victim's bed and place her on her hands and knees as he had done before. Once when she was coming out of the laundry room, he told her to stop and played with himself until he ejaculated. One early December morning, he unsuccessfully tried anal intercourse with her. She was 10 years old at the time.

According to the victim, defendant touched her inappropriately "[p]robably more than 20 times" when she was 10 years old. The last incident took place in August 2003. Defendant was in the grandmother's bed when the victim quietly went through the room to check her cell phone in the bedroom of her grandmother's daughter. Defendant followed the victim, placed her on her hands and knees, and had intercourse with her.

The victim also described an incident when she was watching television on her grandmother's bed and defendant made the victim and her grandmother's daughter put their hands on each other, trying to make the girls grope each other. After defendant left, the victim asked the other girl, "is this, like, just for me?" The other girl replied, "Don't worry about it. Just forget about it." Another time, when the two girls were in bed together, defendant got into the bed and molested the victim and appeared to be doing the same to the grandmother's daughter.

When she was in the seventh grade, the victim told a friend about the incidents, but asked her not to tell anyone because the victim was afraid of what might happen to her family. The friend eventually told her mother, who told the victim's mother, who then found out about the incidents from the victim.

The victim's mother testified the trip to Utah took place in August 2000. After learning about the molestation from her daughter in late September 2003, she called the grandmother and told her about the victim's disclosure. The grandmother called the victim a liar and said there was no way it could have happened. Within a week of the phone call, the victim's mother received a letter from defendant.

/ / /

3

In the four-page, handwritten letter, defendant claimed that the victim's mother was destroying the family by dealing with the accusations in the wrong way. He also indicated he might be in Mexico by the time she read the letter. Defendant alleged the victim used to grab him and reach for people's private parts. He also claimed any inappropriate touches were accidental, and if he was that sick "I woldit [sic] fucker [sic]." Defendant's letter went on to say had he "want it [sic] to fucker [sic]," he "wold it [sic] did it."

Two passages were redacted from the letter, allegations by defendant that the victim was being molested by another person and was using him as a scapegoat, and that she was mad at him because he caught her outside the door with a boy "sucking" his "dick." Over defendant's objection that those portions of the letter should not be redacted, the trial court allowed the prosecutor to introduce the redacted letter but left open the possibility that the redacted portions could be admitted as defense evidence.

Regarding the boy to whom defendant's letter referred, the victim testified she met the boy at the eighth grade "promotion" ceremony for the grandmother's daughter. She had her first kiss with him, but they were just friends. They were once walking together in the front yard of her grandmother's house when defendant told the victim not to get involved with the boy because he lived five hours away from her. At the time, she thought defendant's comment was not "a big deal."

When Deputy Sheriff Alex Nishimura interviewed the victim about the reported molestations, she had considerable difficulty taking about them, several times breaking down and crying after two or three sentences. She could not fully discuss every incident, but she could relate the details of several incidents where defendant molested her during the trip to Utah.

The victim's friend confirmed that the victim confided to her about being molested by defendant, telling her during gym class in the seventh grade. According to the friend, the victim was at first reluctant to tell and was crying and very upset when she finally said she had been raped by her grandmother's boyfriend.

A physical examination of the victim was normal, but an expert testified that over 95 percent of sexually assaulted children have "normal exams." A doctor testifying as a defense expert agreed the exams were normal, but could not conclude from this whether the victim had in fact been molested.

The grandmother's daughter testified she never saw defendant touch the victim inappropriately. She also testified that defendant was not in the middle seat with the victim during the trip to Utah, because he did all the driving due to the grandmother's bad back.

4

According to this witness, defendant did nothing improper to either girl while they were together and she never saw a pornographic magazine in the home.

The boy described in defendant's letter testified he met the victim at the eighth grade graduation and then had a "little . . . summer fling" with her, where he might have been her first kiss. Once, in the summer of 2003, he was sitting outside with her and defendant asked her to go inside. He did not recall the victim getting mad at defendant over this. The boy and the victim did nothing more than kiss each other once or twice.

Defendant's son testified that he never saw anything inappropriate occur between defendant and the victim.

The grandmother testified she never saw pornography in her house and never saw defendant inappropriately touch either girl.

The grandmother's son testified it was not possible for defendant to have molested the victim in the van on the trip to Utah because defendant did all of the driving. The witness once commented to defendant about the victim and the boy doing their "little cuddle thing" on the couch. Defendant then talked to the victim about this, which upset her. Defendant had a vintage Playboy magazine which he kept in his desk, but had no other sexually explicit materials in the house.

Defendant relied on an interpreter in giving his testimony. English was defendant's second language, and defense counsel felt that an interpreter would allow defendant to testify in Spanish, his native tongue, with which he was more comfortable explaining subtleties and complex ideas. According to defendant, the victim was like a friend and granddaughter to him, while the victim's mother was often mad at him and they did not get along. Defendant admitted writing the letter and explained that he was angry at the victim's mother for believing the accusations. He thought about going to Mexico because he was so angry, and stated this in the letter. He felt someone should talk to an alleged perpetrator before going to the police with the accusation. Defendant, who completed only the sixth grade, said he meant "hug" when the letter referred to the victim grabbing him. A statement in the letter that the victim opened her legs to him meant when she would play "horsey" on him. The assertion that he saw her grabbing private parts was derived from defendant thinking the victim had once done this to the boy. Defendant denied doing anything improper to the victim or the grandmother's daughter and denied showing the victim any pornography.

/ / /

/ / /

## II.  APPLICABLE LAW FOR FEDERAL HABEAS CORPUS

An application for writ of habeas corpus by a person in custody under judgment of a state court can only be granted for violations of the Constitution or laws of the United States.  *See* 28 U.S.C. § 2254(a); *see also Peltier v. Wright*, 15 F.3d 860, 861 (9th Cir. 1993); *Middleton v. Cupp*, 768 F.2d 1083, 1085 (9th Cir. 1985) (citing *Engle v. Isaac*, 456 U.S. 107, 119 (1982)). Petitioner filed this petition for writ of habeas corpus after April 24, 1996, thus the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") applies.  *See Lindh v. Murphy*, 521 U.S. 320, 326 (1997).  Under AEDPA, federal habeas corpus relief is not available for any claim decided on the merits in the state court proceedings unless the state court's adjudication of the claim: (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in state court.  *See* 28 U.S.C. § 2254(d); *Perry v. Johnson*, 532 U.S. 782, 792-93 (2001); *Williams v. Taylor*, 529 U.S. 362, 402-03 (2000).

In applying AEDPA's standards, the federal court must "identify the state court decision that is appropriate for our review."  *Barker v. Fleming*, 423 F.3d 1085, 1091 (9th Cir. 2005). "The relevant state court determination for purposes of AEDPA review is the last reasoned state court decision."  *Delgadillo v. Woodford*, 527 F.3d 919, 925 (9th Cir. 2008) (citations omitted). "Where there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting same claim rest upon the same ground."  *Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991).  To the extent no such reasoned opinion exists, courts must conduct an independent review of the record to determine whether the state court clearly erred in its application of controlling federal law, and whether the state court's decision was objectively unreasonable.  *Delgado v. Lewis*, 223 F.3d 976, 981-82 (9th Cir. 2000). "The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher

6

1  threshold." *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) (citing *Williams*, 529 U.S. at 410).

2  "When it is clear, however, that the state court has not decided an issue, we review that question

3  *de novo*." *Reynoso v.Giurbino*, 462 F.3d 1099, 1109 (9th Cir. 2006) (citing *Rompilla v. Beard*,

4  545 U.S. 374, 377 (2005)).

5                    III.  ANALYSIS OF PETITIONER'S CLAIMS

6      1.  Claim I

7         After Petitioner was accused of molesting his girlfriend's granddaughter, he wrote a letter

8  to the victim's mother denying the allegations.  That letter, which is presented in full in the state

9  court opinion below, was read to the jury at Petitioner's trial with two portions redacted.  One of

10  the redactions eliminated a sentence where Petitioner alleged that someone else had molested the

11  victim and that Petitioner was a scapegoat.  In the other redacted section, Petitioner alleged that

12  the victim was lying about the molestation because she was mad at Petitioner for catching her

13  performing oral sex on a male friend.  In Claim I, Petitioner contends that these redactions

14  violated his right to a fair trial.

15         The last reasoned state court decision on this claim is the opinion of the California Court

16  of Appeal on direct appeal.[2]  The court stated as follows:

17           Citing Evidence Code section 356, defendant contends that the trial
             court abused its discretion in denying his request to include the
18           redacted statements in the letter which was introduced to the jury,
             thus resulting in an unfair trial. (Further section references are to
19           the Evidence Code.) We disagree.

20           Defendant's letter, admitted with redactions over his objection,
             read as follows (with the redacted portions included in italics, and
21           with errors in grammar and spelling from the original letter
             included):

22
             ". . . [¶] [B]y the time you get this letters ill be in Mexico or some
23           where ouse. Well Im sorry for all this shit. The Reason Im writen

24  _____

25      [2]    Petitioner also raised this claim in his state petitions for habeas corpus.  However,
    the Superior Court determined that Petitioner could not present the claim in a habeas petition
26  because he had already presented it on direct appeal.  *See* Lodged Doc. No. 10 (Superior Court
    Order Denying Habeas Petition), at 2.

                                    7

you is because I want to tell you someting. Im Realy scare of wht [the victim] is telling you. I want you to know you went the wrong way about it. you destroy me you destroy your own mom and our kids and problobly your own family. you better think about it if one is Responsable for this is Me or [the victim] you see she said I did that to her on the couch Just think about it I sleep on the couch so if I did that to her why she was doing on the couch shes fucking lien and the other think she said I was grabing. shes the one tha grabs People. *I think shes being molested by some body alse and find me as a scape ghot* belime wen I said she is not what she is telling you she is. wen I said she grabs people is because she use to grab me and if I was that sick I wold it fucker she use to come over to my couch and open her legs to me (whit close on) So dont tell me shes tha good every time she come to us she use to gripe about you and chris she said how fucking beach you are and chirs she was telling us she hates chris whit all her heart *I think the Reason she got mad at me an acus me of Molesting her is because I cut her and [the boy] outside the door sucking his dick I call her in the house and the front of everybody and I told her that we are responsible for her for her to Respect that. that we dont want to be Reiponsable if some thing hapen to her. and acorse if you tell her this she is goint to say is Not true.* Like I said if I touch her worng problaby I did it on a accident She use to come to the couch get under the blankets wthit me some times I wasent wearing anything problaby my dick got close to her butt and she tough I was doing something belime I wasent thinking about that wen she got whit me in the couch it was like one moment she was walking by me and the Next moment she was lain down whit me I did not want to say hey I dont have any close on Most of time I tough it was for afection just ask her about grabing if you want thell her is she likes to grab people or Reach for privete parts and see how she Reacts about that Ill bet she be Nerves or act weird while shes lelling you (is not true) like I said Im not fuckin child molester but all this shit makes me like one if I want it to fucker I wold it did it. and you I said you did it the wrong way you shud it talk to us firt I would it go and talk to you about it but I understed how crazy and stupid beach you are you care more for you thand your all family I hope you know what you just did and think about it for ones let you Fucking cells on your brain have a little love for you family and you mom and don be mad at them is not their fault you have a sick [daughter] Just ask her how good she is. and I hope your are proud of what you did whit every one of us like I said if I was you I make [peace symbol] whit you Mom and quit tinkying goody goody of you part if you dont Make [peace symbol] whit them then live whit it then. and dont be a fat slob loud mouth [¶] sinserly you know ho [¶] scuse my writen but Im Realy upset [¶] Please just live your Mom and Kids along they went true a lot already."

In moving to redact the italicized portions, the People argued neither passage was necessary to understand the letter and both were excludable under other rules of evidence. Defendant objected,

asserting the passages were admissible pursuant to section 356. The trial court disagreed, finding the redacted portions were not necessary to understanding the admissions made by defendant in his letter.

Section 356 states in pertinent part: "Where part of an act, declaration, conversation, or writing is given in evidence by one party, the whole on the same subject may be inquired into by an adverse party...." This statute "permits admission of the remainder of an otherwise inadmissible conversation where a part of the conversation has already been admitted. However, the hearsay objection will be overruled only if the remainder of the conversation is relevant to the portion already admitted, i.e., if it has ' "some bearing upon, or connection with, the admission or declaration in evidence. . . ." ' [Citation.]" *Carson v. Facilities Development Co.* (1984) 36 Cal.3d 830, 850, fn. omitted.) We review the trial court's decision for an abuse of discretion. (*People v. Alvarez* (1996) 14 Cal.4th 155, 201.)

The first redacted statement (the claim that the victim was making defendant a scapegoat for someone else molesting her) was not extensively discussed by the parties at trial. In moving to redact it, the People asserted that this third party liability evidence was inadmissible, citing *People v. Hall* (1986) 41 Cal.3d 826. The trial court indicated that limitations on third party culpability evidence could prevent defendant from asserting someone else molested the victim. Defense counsel replied, "That would go to the first one," and then discussed admissibility of the second redacted statement. There was no further discussion specifically addressing the first statement.

The second statement (concerning the purported sex act between the victim and the boy) was discussed more extensively. In ruling that section 356 did not prevent redacting this statement, the trial judge declared he was "not saying it would never come in. It very well could be a – admissible on motive to fabricate," however "it would require this to come in through the defense."

After the ruling, the prosecutor stated her motion also encompassed "any questions" defense counsel "might have of his own witnesses" concerning defendant purportedly catching the victim in a sex act with the boy. Defense counsel suggested a relevant nonhearsay purpose for this line of inquiry, showing animosity between the victim and defendant after "a big blowout" over the alleged incident with the boy. The prosecutor disputed whether there was a such a "blowout." Defense counsel then clarified that he was not seeking to introduce the evidence "to show that there was any particular act" but to show "defendant thought there was" and "there was animosity between the defendant and the complaining witness over him castigating her." Counsel noted he neither cared nor thought there was any sex act between the victim

9

and the boy, and, according to the boy's statement, "defendant was mistaken about what was happening."

The trial court confirmed that defense counsel wished to ask his witnesses and the victim about the incident with the boy and defendant. Counsel reiterated that he did not think there were any sex acts between the victim and the boy and did not care if there were; what mattered was whether defendant thought there had been and if he castigated the victim about it, causing a problem between them.

The trial court and the parties subsequently agreed that, without bringing up the "Oral cop," defense counsel could ask the victim whether she thought defendant had been angry with her or whether he confronted her about the boy. Defense counsel reiterated that unless he could "think of some reason that is relevant," he would not ask the victim about what specifically happened.

The trial court stated that defendant could later revisit whether the two redacted statements were admissible.

Before defendant testified, defense counsel informed the tria [sic] court that he expected defendant to explain "some of the areas that are in the redacted area" of the letter, specifically " 'what she was doing with [the boy].' " Counsel said that if defendant is "asked to explain them, honestly he will say, 'I am referring to what she was doing with [the boy].' " The court replied, "I think that's okay. I think that's in the evidence." Counsel reiterated that defendant had a right to explain the letter "now that it's in", and the court asked if he was going to say anything more about the boy. Counsel replied that defendant "is going to say it in the context that is going to be sexually suggestive like grabbing and asked her if she grabs people's privates, and he is going to say that has to do with [the boy]," and concluded by arguing that the People cannot put in defendant's prior statement and limit his ability to explain it. The court agreed defendant "can say that if that's what he truly would say."

During his examination, defendant did not mention either of the redacted statements from his letter.

The People correctly assert there was no error because defendant was in fact given the opportunity to introduce the redacted statements but chose not to do so.

Section 356 does not forbid redacting portions of the original statement. By saying "the same subject may be inquired into by an adverse party," the statute allows a defendant to introduce the redacted portions on his or her own if relevant to explain the prior statement. (Evid.Code, § 356; *People v. Arias* (1996) 13 Cal.4th 92, 156 ["if a party's oral admissions have been introduced in

1    evidence, he may show other portions of the same interview or
     conversation" if relevant to the admission].)
2
     Although the trial court initially ruled against defendant on his
3    section 356 motion, it made clear this did not prevent defendant
     from revisiting the issue. He did not revisit the admissibility of the
4    first statement, and while discussions over the second redacted
     statement showed that the court was willing to allow defendant to
5    introduce it through his own testimony, defendant declined the
     invitation. Because defendant did not try to introduce either
6    statement, there was no error.

7   Slip Op. at 8-14.

8        "[S]tate and federal rulemakers have broad latitude under the Constitution to establish

9   rules excluding evidence from criminal trials." *United States v. Scheffer*, 523 U.S. 303, 308

10  (1998); *see also Crane v. Kentucky*, 476 U.S. 683, 689-90 (1986); *Marshall v. Lonberger*, 459

11  U.S. 422, 438, n. 6 (1983); *Chambers v. Mississippi*, 410 U.S. 284, 302-03 (1973); *Spencer v.

12  Texas*, 385 U.S. 554, 564 (1967).  This latitude, however, has limits.  "Whether rooted directly in

13  the Due Process Clause of the Fourteenth Amendment or in the Compulsory Process or

14  Confrontation Clauses of the Sixth Amendment, the Constitution guarantees criminal defendants

15  'a meaningful opportunity to present a complete defense.'"  *Crane*, 476 U.S. at 690 (quoting

16  *California v. Trombetta*, 467 U.S. 479, 485 (1984) (citations omitted)).  This right is abridged by

17  evidence rules that "infring[e] upon a weighty interest of the accused" and are "'arbitrary' or

18  'disproportionate to the purposes they are designed to serve.'"  *Scheffer*, 523 U.S. at 308 (quoting

19  *Rock v. Arkansas*, 483 U.S. 44, 58, 56 (1987)).

20       The first redacted statement, alleging that someone other than Petitioner was molesting

21  the victim, was redacted pursuant to *People v. Hall*, 41 Cal.3d 826, 833, 226 Cal.Rptr. 112, 718

22  P.2d 99, 103-04 (1986), which held that third-party liability evidence is inadmissable unless it is

23  capable of raising a reasonable doubt of defendant's guilt.  "[C]ourts should simply treat

24  third-party culpability evidence like any other evidence: if relevant it is admissible unless its

25  probative value is substantially outweighed by the risk of undue delay, prejudice, or confusion."

26  *Id.* at 834 (citations omitted).

1    In *Holmes v. South Carolina*, 547 U.S. 319, 323-34, 331 (2006), a unanimous Supreme

2    Court held that an evidentiary rule that permits admission of third-party culpability evidence if it

3    "'raise[s] a reasonable inference or presumption as to [the defendant's] own innocence'" but not

4    if it merely "'cast[s] a bare suspicion upon another'" or "'raise[s] a conjectural inference as to the

5    commission of the crime by another'" violated the Constitution.   The rule rejected in *Holmes*

6    created a higher threshold for the introduction of third-party culpability evidence than that

7    followed by California.  *Id.* at 327.  On the other hand, evidentiary rules that prohibit the

8    introduction of third-party culpability evidence based upon a specific application of generally

9    accepted evidentiary rules are "widely accepted."  *Id.* at 327, fn.\* (citing, amongst cases from

10   several states, *People v. Hall*).  The rule adopted by California in *People v. Hall* is of the latter

11   variety: third-party culpability evidence is treated like any other evidence and is admissible

12   unless its probative value is substantially outweighed by the risk of undue delay, prejudice, or

13   confusion.  *Hall*, 41 Cal.3d at 834.  These basic and well-founded evidentiary rules are permitted

14   by the Constitution.  *Crane*, 476 U.S. at 689-90 (quoting *Delaware v. Van Arsdall*, 475 U.S. 673,

15   679 (1986)); *see also Montana v. Egelhoff*, 518 U.S. 37, 42 (1996) (plurality opinion) (terming

16   such rules "familiar and unquestionably constitutional").

17   In Petitioner's letter, he alleges that the victim was molested by someone else and that he

18   was simply a scapegoat.  Petitioner did not present any additional evidence that someone else

19   was molesting the victim or provide any basis for his belief.  The statement, by itself, was

20   insufficient to raise a doubt as to Petitioner's guilt.  As such, the California Court of Appeal

21   made a reasonable determination when it concluded that the redaction of the first statement did

22   not violate Petitioner's constitutional rights.

23   In the second redacted statement Petitioner offered an explanation for why the victim may

24   have allegedly been fabricating her story.  While the trial court permitted the prosecution to

25   redact the statement from the letter when the prosecution entered it into evidence, the court never

26   held that Petitioner was prevented from introducing the statement or other evidence related to the

victim's motive to fabricate in his defense.  *See* Rep.'s Tr. at 20 ("I am not saying it would never

come in.  It very well could be a – admissible on motive to fabricate . . . but it would require this

to come in through the defense.").  For instance, the trial court allowed Petitioner's counsel to

cross-examine the victim with regard to the incident mentioned in the redacted statement, which

permitted Petitioner to attempt to establish a defense that the victim was fabricating the

molestation because she was mad at the Petitioner.  *Id.* at 31 ("I will let you question her about

whether she – there was an incident where she was outside the house with her boy friend and the

defendant arrived and did she perceive Mr. Galvez to be angry with her for being outside with

her boy friend and if she says, no, that's fine.  If she says , yes, then did that cause a rift between

you ans Mr. Galvez?").  When Petitioner testified, his counsel was also permitted to ask him

about the alleged incident between the victim and her boyfriend.  *Id.* at 373-74.  Petitioner's

counsel made the strategic choice not to ask him directly about the redacted statement in his

letter.

Although the trial court redacted the second statement when the letter was introduced by

the prosecution, it allowed Petitioner to present evidence regarding the victim's potential motive

to fabricate her story.  The jury was not prevented from hearing any evidence about the victim

being upset with Petitioner because he caught her doing something inappropriate with her boy

friend.  As such, the California Court of Appeal reached a reasonable conclusion when it

determined that suppression of the second statement did not violate Petitioner's constitutional

rights.  Relief on this claim should be denied.

2. Claim II

Petitioner next claims that his trial was fundamentally unfair because he was denied

access to a Spanish language interpreter throughout the duration of his trial.  Petitioner alleges

that he "didn't understand what was transpiring between the counsels and the judge, nor was he

able to effectively articulate his needs for certain defense tactics to his attorney or witnesses for

his defense and evidence that would show his innocence if investigated."  Am. Pet. at 5.

In ruling on this Claim, the California Court of Appeal concluded that Petitioner did not need an interpreter because his understanding of English was sufficient to understand the proceedings and to effectively communicate with his attorney:

> Substitute counsel filed a motion for new trial, asserting that defendant, whose primary language was Spanish, was denied due process of law because he was not provided with an interpreter for most of the trial.
>
> A hearing was held and numerous witnesses were examined. Defendant testified as follows:
>
> Defendant was born in Mexico and left for Los Angeles at the age of 14 or 15. He went to school for four or five years in Mexico and found English difficult to learn.
>
> He thought around three lawyers had represented him. When the case first started, he asked his attorney for an interpreter, but the attorney said defendant would not have one at that time. No judge or lawyer ever asked defendant if he needed an interpreter, leading defendant to conclude the system did not use interpreters.
>
> After learning that he could have an interpreter for his testimony, defendant did not request one for his trial because he still thought the judicial system operated without interpreters. He did not understand much of what happened during the trial and would have preferred having an interpreter.
>
> When defendant lived with the victim's grandmother, her children, and his son from 1993 to 2003, English was the primary language spoken in the house. He admitted speaking English with his American-born son and his girlfriend.
>
> At the waiver of preliminary hearing an attorney went over a form with him and asked if defendant understood it. Defendant said no, but counsel pushed him to sign the form. Defendant also might have told counsel that he needed an interpreter to explain the form. From what defendant could understand, counsel said "no" there was not an interpreter around. Defendant signed the form under protest and did not understand what he had signed.
>
> Trial counsel testified as follows: He spoke minimal Spanish and communicated with defendant only in English. He felt that defendant was able to adequately assist him in preparing for trial, and counsel understood everything defendant said to him. Counsel felt an interpreter was needed for defendant's testimony primarily to allow defendant to explain to the jury what he meant and was thinking when he wrote the letter.

Defendant's preliminary hearing attorney did not recall representing defendant, but testified that if defendant wanted an interpreter, the attorney would have presented a request to the court. Counsel typically went over the preliminary hearing waiver form and made sure his clients read it. He would never force a client to sign a form he did not understand.

Two other attorneys could not remember representing defendant, but would always honor a client's request for an interpreter. The attorney who represented defendant near the trial readiness conference did not recall if defendant asked for an interpreter, but would have brought the matter to the court's attention had a request been made. He never told clients that courts do not provide interpreters.

A conflict public defender first met defendant just before or after a settlement conference in chambers. He spoke some Spanish and had many Spanish speaking clients, but counsel determined that he could not convey some concepts to defendant in Spanish, so he asked defendant if he could revert to English. The subject of an interpreter never came up, but if he had represented defendant at trial, he would have asked for an interpreter.

In denying the new trial motion, the trial court found that defendant's claim was "a ruse" to get a new trial when he did in fact understand the proceedings.

Defendant claims that the failure to provide an interpreter violated his state constitutional right to an interpreter (Cal.Const ., art. I, § 14) and his federal rights to due process, fair trial, and counsel (U.S. Const., 5th, 6th & 14th Amends.). We are not persuaded.

A defendant claiming the right to an interpreter has the burden to show an affirmative need for one. (*In re Raymundo B.* (1988) 203 Cal.App.3d 1447, 1453; *People v. Carreon* (1984) 151 Cal.App.3d 559, 566-567.) We review an order denying a new trial motion for abuse of discretion. (*People v. Navarette* (2003) 30 Cal.4th 458, 526.)

"The prerequisite to an appointment of an interpreter is ... that the person charged with a crime be 'unable to understand English,' not that he demand an interpreter." (*In re Raymundo B.*, *supra*, 203 Cal.App.3d at p. 1453.) While a defendant's statement that he does not understand English and needs an interpreter "may be some evidence of the fact that the charged individual does not understand English, it cannot be considered conclusive proof of that lack of proficiency in English." (Ibid.)

Here, it is readily apparent that defendant understood English. He spoke English to his girlfriend (the victim's grandmother) and their children, and he wrote in English, although poorly. His use of an

15

1   interpreter when testifying, as defense counsel made clear, was
    only to allow him to convey the subtleties and complex issues
2   when testifying about his letter. Trial counsel never had a problem
    communicating with defendant, and defendant's claims regarding
3   his other attorneys were contrary to their established practices.

4   Substantial evidence supports the trial court's finding that
    defendant's claimed need for an interpreter was a ruse; therefore,
5   the court did not abuse its discretion in denying the motion for a
    new trial.

6

7   Slip Op. at 14-18.

8        The Supreme Court of the United States has never directly addressed whether non-

9   English speakers have a constitutional right to an interpreter at trial.  *See United States v. Si*, 333

10  F.3d 1041, fn. 3 (9th Cir. 2003).  It would, however, seem to be a fundamental principal that in

11  order for a defendant's constitutional rights to be adequately protected he needs to be able to

12  understand the proceedings against him and effectively communicate with the court and his

13  attorney.  *See Meyer v. Nebraska*, 262 U.S. 390, 401 (1923) ("the individual has certain

14  fundamental rights which must be respected. The protection of the Constitution extends to all, to

15  those who speak other languages as well as to those born with English on the tongue." );

16  *Farrington v. Tokushige*, 273 U.S. 284, 298 (1927) (stating that the Constitution protects "those

17  who speak another tongue").  Some circuits recognize a right to an interpreter when a defendant's

18  inability to communicate in English interferes with the defendant's Sixth Amendment right to

19  confrontation or the defendant's Fifth Amendment due process right or his right to testify on his

20  own behalf.  *See United States v. Lim*, 794 F.2d 469, 470 (9th Cir. 1986) (citing cases).

21       The Supreme Court has recognized the Sixth Amendment's guarantee of counsel requires

22  the defendant to be provided the effective assistance of counsel.  *McMann v. Richardson*, 397

23  U.S. 759, 771, n. 14 (1970) ("the right to counsel is the right to the effective assistance of

24  counsel.").  "The right to counsel plays a crucial role in the adversarial system embodied in the

25  Sixth Amendment, since access to counsel's skill and knowledge is necessary to accord

26  defendants the 'ample opportunity to meet the case of the prosecution' to which they are

16

1   entitled.'"" *Strickland v. Washington*, 466 U.S. 668, 685 (1984) (citing *Adams v. United States ex*
2   *rel. McCann*, 317 U.S. 269, 275, 276 (1942)); *see also Powell v. Alabama*, 287 U.S. 45, 68-69
3   (1932).  Implicit in the Supreme Court's Sixth Amendment jurisprudence is the determination
4   that a defendant must be able to effectively communicate with his attorney.  *See, e.g.*, *Strickland* ,
5   466 U.S. at 688 ("From counsel's function as assistant to the defendant derive the overarching
6   duty to advocate the defendant's cause and the more particular duties to consult with the
7   defendant on important decisions and to keep the defendant informed of important developments
8   in the course of the prosecution.").

9        Assuming that clearly established federal law, as determined by the Supreme Court of the
10  United States, creates a constitutional right to an interpreter where a defendant cannot effectively
11  communicate with his attorney in English, it is a reasonable determination that no such
12  deprivation occurred in this case.

13       Petitioner initially raised his claim in a motion for a new trial.  The trial court held an
14  evidentiary hearing to determine whether Petitioner required the assistance of a translator.
15  During the hearing, Petitioner testified about his ability to understand English.  Petitioner, who
16  was raised in Mexico until the time he was fourteen or fifteen, was not taught English in school.
17  When he moved to the United States, Petitioner worked at a gas station in Los Angeles and then
18  as a strawberry picker in Northern California.  Later, at the time of the molestations, he worked at
19  a mill.  He spoke Spanish at these jobs and was not interested in learning English.  When asked if
20  he wrote in English, Petitioner said: "Sometimes I – I try, but it doesn't come out pretty good.  I
21  need to have a dictionary with me."  Petitioner did not find English easy to learn.  When asked if
22  he would have preferred to have an interpreter present during the trial, Petitioner said: "Very
23  much so, because sometimes I was not understanding what they were saying."

24       On cross-examination, Petitioner admitted that the primary language he spoke with a
25  woman he lived with from 1993 to 2003 was English and that he had a son in the United States
26  that he communicated with in English.  Petitioner also spoke with the victim in English.

1   Petitioner did maintain, however, that all of these communications were very basic and that the

2   majority of the time he was in the United States he spoke Spanish.

3       Petitioner's trial attorney also testified.[3]  He testified that had he felt that an interpreter

4   was necessary to adequately represent Petitioner he would have requested one.  He only

5   communicated with Petitioner in English, both during and in preparation for trial.  Importantly,

6   Petitioner's trial counsel believed Petitioner was adequately able to assist him in preparing for

7   trial speaking only English.  Counsel could not remember any conversation that was incomplete

8   due to a language barrier and agreed that Petitioner understood "simple" English.  He was not

9   aware of Petitioner having any problems understanding what was going on in the courtroom.

10      Several attorneys who had represented Petitioner during pre-trial procedures also testified

11  at the evidentiary hearing.  Most did not remember Petitioner but stated that if he had requested

12  an interpreter it would have been their policy to present such a request to the court.  One attorney,

13  who only represented Petitioner very briefly, said that he had spoken to Petitioner in Spanish but

14  that he had switched to English because he could not convey complex ideas in Spanish.

15  Petitioner spoke to him in English.  Based upon that attorney's experience, he would have

16  requested an interpreter for Petitioner at trial.

17      The trial court, ruling from the bench, denied Petitioner's motion for a new trial.  The

18  court concluded, as was upheld by the California Court of Appeal, that Petitioner's claim that he

19  could not understand English was a "ruse . . . to try to get a new trial" and that Petitioner did

20  understand the proceedings against him.  In habeas, the factual determinations of the state court

21  are presumed to be correct.  28 U.S.C. § 2254(e)(1).  The burden is on the Petitioner to rebut the

22  presumption by clear and convincing evidence.  *Id.*  Furthermore, under the circumstances of this

23  case, the writ can only be granted if the state court's adjudication of the proceeding "resulted in a

24

25          [3]      Petitioner was represented by new counsel on the motion for a new trial.  The trial
26  court concluded that Petitioner had constructively waived the attorney-client privilege by making
    those communications an issue in the motion.

1   decision that was based on an unreasonable determination of the facts in light of the evidence

2   presented in the State court proceeding." *Id.* § 2254(d)(2); *see Miller-El v. Cockrell*, 537 U.S.

3   322, 348 (2003) ("To secure habeas relief, petitioner must demonstrate that a state court's

4   finding. . . was incorrect by clear and convincing evidence, 28 U. S. C. § 2254(e)(1), and that the

5   corresponding factual determination was 'objectively unreasonable' in light of the record before

6   the court."). Petitioner has failed to rebut the state court's determination that he understood the

7   proceedings and the state court's determination was reasonable based on the evidence presented

8   at trial and during the evidentiary hearing on the motion for a new trial. While Petitioner is

9   originally from Mexico, he had been in the United States for twenty-seven years prior to his trial.

10   English was the primary language spoken at his home and his only means of communicating with

11   his girlfriend and son, as well as other people within his community. Petitioner's trial counsel

12   believed Petitioner was adequately able to assist him in preparing for trial speaking only English.

13   Petitioner should be denied relief on this claim.

14        3. Claims III and IV

15        In Claims III and IV, Petitioner raises claims for ineffective assistance of counsel. In

16   Claim III, Petitioner alleges that both trial and appellate counsel were ineffective in failing to

17   introduce additional evidence, such as the victim's school records or Petitioner's work history,

18   which Petitioner claims would have proved the victim's lies and supported the testimony of the

19   defense witnesses. In Claim IV, Petitioner alleges that his counsel was ineffective for failing to

20   introduce specific evidence that Petitioner had been at work in California during the time frame

21   that he was allegedly on a vacation to Utah and molesting the victim.

22        The Sixth Amendment guarantees effective assistance of counsel. In *Strickland v.*

23   *Washington*, 466 U.S. 668 (1984), the Supreme Court articulated the test for demonstrating

24   ineffective assistance of counsel. First, the petitioner must show that considering all the

25   circumstances, counsel's performance fell below an objective standard of reasonableness. *See id.*

26   at 688. Petitioner must identify the acts or omissions that are alleged not to have been the result

1  of reasonable professional judgment.  *See id.* at 690.  The federal court must then determine

2  whether in light of all the circumstances, the identified acts or omissions were outside the range

3  of professional competent assistance.  *See id.*  "[C]ounsel is strongly presumed to have rendered

4  adequate assistance and made all significant decisions in the exercise of reasonable professional

5  judgment."  *Id.*

6         Second, a petitioner must affirmatively prove prejudice.  *See id.* at 693.  Prejudice is

7  found where "there is a reasonable probability that, but for counsel's unprofessional errors, the

8  result of the proceeding would have been different."  *Id.* at 694.  A reasonable probability is "a

9  probability sufficient to undermine the confidence in the outcome."  *Id.*  The likelihood of a

10 different result must be substantial, not just conceivable."  *Harrington v. Richter*, __ U.S. __, 131

11 S.Ct 770, 791, 178 L.Ed.2d 624 (2011).  A reviewing court "need not determine whether

12 counsel's performance was deficient before examining the prejudice suffered by defendant as a

13 result of the alleged deficiencies . . . [i]f it is easier to dispose of an ineffectiveness claim on the

14 ground of lack of sufficient prejudice . . . that course should be followed."  *Pizzuto v. Arave*, 280

15 F.3d 949, 955 (9th Cir. 2002) (citing *Strickland*, 466 U.S. at 697).  When analyzing a claim for

16 ineffective assistance of counsel where a state court has issued a decision on the merits, a habeas

17 court's ability to grant the writ is limited by two "highly deferential" standards.  *Premo v. Moore*,

18 __ U.S. __, 131 S.Ct. 733, 740, 178 L.Ed.2d 649 (2011).  "When § 2254(d) applies," as it does

19 here, "the question is not whether counsel's actions were reasonable.  The question is whether

20 there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard."  *Id.*

21         A.  Claim III

22         Petitioner should be denied relief on Claim III because he fails to provide the evidence

23 that his counsel allegedly should have discovered.  Petitioner presents this claim in conclusory

24 fashion without elaboration on exactly what evidence would have been discovered or showing

25 how it would have affected the outcome of his trial.  Without more, Petitioner cannot show that

26 but for counsel's unprofessional errors, the result of the proceeding would have been different.

1   Moreover, even if such evidence does exist, Petitioner fails to show how the absence of such

2   evidence rendered Petitioner's trial fundamentally unfair.  The victim's testimony was subject to

3   the crucible of the adversarial process.  As Petitioner notes, several witnesses testified that the

4   victim's story was a fabrication.  The jury, however, determined that it was the victim's

5   testimony that was credible.  Petitioner fails to show that it is reasonably likely that had the

6   additional evidence been introduced the outcome of the proceedings would have been different.

7   As such, his claim should be denied.

8               B.  Claim IV

9          In Claim IV, Petitioner alleges his counsel was ineffective for failing to investigate and

10  introduce records from Petitioner's employer that he was at work during August of 2000.

11  Petitioner attaches his work records as exhibits to his petition which show he worked every day

12  from the seventh of August to the thirty-first, except the thirteenth and twentieth.  The records

13  show Petitioner as being on vacation or not working from July 29, 2000 to August 6, 2000.

14  These records were also submitted to the state court in Petitioner's state petition for habeas

15  corpus and Petitioner alleges they are significant because in the victim's testimony she said that

16  she was molested, amongst other occasions, on a trip to Utah in August of 2000.

17         The last reasoned state court decision on this claim is the decision of the Shasta County

18  Superior Court on Petitioner's petition for habeas corpus.  In addressing this claim, the court

19  stated as follows:

20              Petitioner's . . . claim is without merit.  The issue of ineffective
               assistance of counsel was directly addressed by the California
21              Supreme Court for the purposes of Habeas Corpus in *People v.*
               *Karis* (1988) 46 Cal.3d 612, at p. 657.  The court stated a petitioner
22              must show counsel's performance "fell below an objective
               standard of reasonableness . . . under prevailing professional
23              norms." Then, the petitioner is required to demonstrate a
               "reasonable probability exists that a more favorable outcome
24              would have been reached absent the deficient performance."  (*In re*
               *Codero* (1988) 46 Cal.3d 161 at p. 180.)
25
               Petitioner has not demonstrated that he would have experienced a
26             more favorable verdict absent counsel's alleged ineffective

assistance.  A petitioner bears a heavy burden initially to plead sufficient grounds for relief.  (*People v. Duvall* (1995) 9 Cal.4th 464, 474.)  Petitioner claims that introduction of his work history would have rebutted the victim's allegation that sexual molestation occurred on a trip to Utah.  However, Petitioner completely ignores the fact that the victim testified she was molested by Petitioner numerous other times outside of the trip to Utah.  Specifically, the victim testified that she was molested by Petitioner between 15 to 20 times at her grandmother's home, in Nevada, and on the trip to Utah.  Even if the jury had accepted as true that a molest did not occur on the trip to Utah, the victim's testimony about being molested by Petitioner 15 to 20 *other* times was enough evidence for a jury to convict Petitioner on the charged counts within the charged time period.

Lodged Doc. No. 10 (Superior Court Denial of Habeas Petition), at 1-2.

The Superior Court's decision correctly applied the constitutional standard for ineffective assistance of counsel set forth in *Strickland* and its determination that Petitioner did not suffer prejudice as a result of the alleged ineffective assistance is reasonable.  As the Superior Court concluded, there was ample evidence that Petitioner molested the victim other than on the trip to Utah to support the conviction.  Perhaps more importantly, the evidence provided by Petitioner does *not*, even assuming its contents are true, prove that Petitioner and the victim did not take a vacation to Utah during August of 2000.  Indeed, the work history report lists Petitioner as on "vacation" the first, second, third, and fourth of August and lists his next day actually worked as the seventh.  Thus, the work history report does not prove that the victim was lying about the trip taking place, or the actions that occurred on the trip, and the evidence would have had little bearing on the jury in determining its verdict.

The standard created by AEDPA is a difficult one for Petitioner to meet.  *Harrington*, 131 S.Ct. at 786.  "It preserves authority to grant the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with" clearly established federal law, as determined by the Supreme Court of the United States.  *Id.*; *see* 28 U.S.C. § 2254(d)(1).  When a Petitioner presents a claim of ineffective assistance of counsel, "a federal habeas court may not issue the writ simply because that court concludes in its independent

1    judgment that the state-court decision applied *Strickland* incorrectly.  Rather, it is the habeas

2    applicant's burden to show that the state court applied *Strickland* to the facts of his case in an

3    objectively unreasonable manner." *Woodford v. Visciotti*, 537 U.S. 19, 24-25 (2002) (citations

4    omitted).  In Petitioner's case, the Superior Court made a reasonable determination when it

5    concluded that the failure to introduce Petitioner's work records did not cause prejudice to his

6    case.  As such, Petitioner should be denied relief on his final claim.

7                            IV.  REQUEST FOR AN EVIDENTIARY HEARING

8            Finally, Petitioner requests an evidentiary hearing on his Claims.  *See* Doc. No. 33

9    (Motion for Evidentiary Hearing).  A court presented with a request for an evidentiary hearing

10   must first determine whether a factual basis exists in the record to support petitioner's claims,

11   and if not, whether an evidentiary hearing "might be appropriate." *Baja v. Ducharme*, 187 F.3d

12   1075, 1078 (9th Cir. 1999); *see also Earp v. Ornoski*, 431 F.3d 1158, 1166 (9th Cir. 2005).  A

13   petitioner requesting an evidentiary hearing must also demonstrate that he has presented a

14   "colorable claim for relief." *Earp*, 431 F.3d at 1167 (citations omitted).  To show that a claim is

15   "colorable," a petitioner is "required to allege specific facts which, if true, would entitle him to

16   relief." *Ortiz v. Stewart*, 149 F.3d 923, 934 (9th Cir. 1998) (internal quotation marks and citation

17   omitted).  In this case, Petitioner's claims are readily determined by the record.  Petitioner has not

18   alleged any additional facts that, if true, would entitle him to relief and, therefore, Petitioner fails

19   to demonstrate that he has a colorable claim for federal habeas relief.  Moreover, the Supreme

20   Court has recently held that federal habeas review under 28 U.S.C. § 2254(d)(1) "is limited to the

21   record that was before the state court that adjudicated the claim on the merits" and "that evidence

22   introduced in federal court has no bearing on" such review. *Cullen v. Pinholster*, __ U.S. __, 131

23   S.Ct. 1388, 1398, 1400 (2011).  Thus, his request will be denied.

24   / / /

25   / / /

26   / / /

V.  CONCLUSION

Accordingly, IT IS HEREBY ORDERED that Petitioner's request for an evidentiary hearing is DENIED.

For all of the foregoing reasons, IT IS HEREBY RECOMMENDED that the petition for writ of habeas corpus be DENIED.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty-one days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections shall be served and filed within seven days after service of the objections.  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).  In any objections he elects to file, Petitioner may address whether a certificate of appealability should issue in the event he elects to file an appeal from the judgment in this case.  *See* Rule 11, Federal Rules Governing Section 2254 Cases (the district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant).

DATED:  December 6, 2011

TIMOTHY J BOMMER
UNITED STATES MAGISTRATE JUDGE

24